# Illinois Official Reports

## Appellate Court

*In re J.C.*, 2020 IL App (2d) 200063

| | |
|---|---|
| Appellate Court Caption | *In re* J.C. and A.K., Minors (The People of the State of Illinois, Petitioner-Appellee v. Shannon S., Respondent-Appellant). |
| District & No. | Second District No. 2-20-0063 |
| Rule 23 order filed Motion to publish allowed Opinion filed | June 18, 2020 July 6, 2020 July 6, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, Nos. 17-JA-367, 18-JA-185; the Hon. Mary Linn Green, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Azhar J. Minhas, of Belvidere, for appellant. Marilyn Hite Ross, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel                        JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices Hutchinson and Hudson concurred in the judgment and opinion.

## OPINION

¶ 1       Respondent, Shannon S., appeals from the trial court's order finding her to be an unfit parent and subsequently terminating her parental rights to her two children, J.C. and A.K. Specifically, she claims that the trial court erred when, at the unfitness hearing, it allowed into evidence (1) two guardian *ad litem* (GAL) exhibits that were irrelevant for the purpose of the unfitness hearing and (2) two GAL exhibits that did not qualify as indicated reports under section 2-18(4)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-18(4)(b)(West 2018)) and therefore contained inadmissible hearsay. For the following reasons, we affirm.

¶ 2                                  I. BACKGROUND

¶ 3       On November 23, 2017, the Department of Children and Family Services (DCFS) received a hotline call reporting that respondent had given birth to J.C. and he had tested positive for cocaine, benzolecgonine, opiates, codeine, and morphine. Respondent had admitted to active use of cocaine and opiates when she came into the hospital. Respondent had also told the reporter that she had another child at home. It was learned that respondent had given the hospital a false name and address after she discharged herself against medical advice while J.C. was still in the neonatal intensive care unit, suffering from symptoms of drug withdrawal.

¶ 4       On December 12, 2017, the State filed a neglect petition in case No. 2017-JA-367 (J.C.'s case). That petition contained four counts alleging that J.C. was a neglected minor pursuant to section 2-3 of the Juvenile Court Act (705 ILCS 405/2-3 (West 2016)). Counts I and II respectively alleged that J.C. was neglected because he was born with cocaine and opiates in his system. *Id.* § 2-3(1)(c). Count III alleged that J.C.'s environment was injurious to his welfare in that respondent had a substance abuse problem that prevented her from properly parenting, putting J.C. at risk. *Id.* § 2-3(1)(b). Count IV alleged that J.C. was neglected because he was not receiving the necessary care for his well-being, including food, clothing, and shelter, or he had been abandoned at birth. *Id.* § 2-3(1)(a).

¶ 5       On February 8, 2018, an adjudicatory hearing was held. The court accepted the parties' agreement that, in exchange for respondent stipulating to count II in the neglect petition, the State would dismiss the other three counts. At a dispositional hearing on March 8, 2018, the court found that respondent was unfit or unable to care for, protect, or discipline J.C. DCFS had temporary custody of J.C. and was then given the discretion to place him with a responsible relative or in foster care.

¶ 6       On June 12, 2018, DCFS received a hotline report that respondent had called police dispatch and reported shots being fired at her home. Respondent told the police that the shooting was due to a "drug deal gone bad" and that her child, three-year-old A.K., was present. A DCFS investigator spoke to respondent the next day. Respondent admitted to the investigator that she used heroin and crack, and she showed the investigator the "tracks" on her arms.

¶ 7        Based upon these events, the State filed a petition alleging that A.K. was a neglected minor, in case No. 18-JA-185 (A.K.'s case). That petition had four counts. Counts I and IV were directed at respondent, and counts II and III were directed at A.K.'s biological father. Count I alleged that A.K.'s environment was injurious to her welfare, based upon respondent's drug use. 705 ILCS 405/2-3(1)(b) (West 2018). Count IV alleged that A.K.'s environment was injurious to her because her sibling, J.C., had already been adjudicated neglected and respondent had failed to correct the conditions that led to J.C. being brought into care, placing A.K. at risk of harm. *Id.*

¶ 8        On June 15, 2018, the parties appeared in court for a shelter-care hearing in A.K.'s case. At the hearing, both parents stipulated to a finding of probable cause and of an immediate and urgent necessity for the removal of A.K. On August 6, 2018, the parties appeared in court for a pretrial conference in A.K.'s case and a permanency review in J.C.'s case. Lutheran Social Services (LSS) filed a report indicating that respondent was actively using heroin and thus had not been referred for any services. She was also not allowed visits with A.K. and J.C. due to her drug use. The trial court found that respondent had not made reasonable efforts or progress, and it maintained the goal for the children to return home within 12 months.

¶ 9        On October 24, 2018, an adjudicatory hearing in A.K.'s case took place. Michael Landgraff, a Rockford police officer, testified that he was on duty on June 12, 2018, around 10:30 p.m. when he was sent to 400 South First Street in Rockford for a "shots fired" call. Upon arrival, he spoke to respondent, who told him that her daughter and brother were in the house. She explained that she and her brother had been outside her house engaged in a drug deal that she had arranged when something went wrong. Respondent heard five or six gunshots and ran back into the house. Through the window she saw her brother running down the street with her daughter. Landgraff said that the police were unable to find respondent's daughter. According to respondent, her brother was a drug addict. The police recovered three shell casings and a bag containing a white, rock substance, which tested positive for cocaine. Respondent told Landgraff that her daughter's birthday was February 26, 2015.

¶ 10        Amanda Dickens testified that she was an LSS caseworker on J.C.'s case and that J.C. was A.K.'s younger brother. Dickens said that respondent did not maintain regular contact with Dickens and was not currently working on any service goals.

¶ 11        The State moved to admit group exhibit 1, which included certified copies of J.C.'s neglect petition, orders of adjudication and disposition, and an August 6, 2018, permanency-review order. It also moved to admit group exhibit 2, which contained the certified DCFS records in A.K.'s case, and group exhibit 3, which contained the certified DCFS records in J.C.'s case. The exhibits were admitted without objection.

¶ 12        In its final comments, the State noted that the man whom respondent had represented was her brother was actually the biological father of J.C. and A.K. The State argued that respondent had a substance abuse problem and had not completed any services. The case was continued for a decision on adjudication and disposition.

¶ 13        On November 14, 2018, the case was in court for an adjudication and possible disposition in A.K.'s case and a permanency review in J.C.'s case. Respondent did not appear in court, and her counsel told the court that he had had no communication with her. The court found that the State had met its burden of proof as to all counts in the State's petition in A.K.'s case and therefore found her to be a neglected minor. Regarding J.C., the trial court ruled that respondent had not made reasonable efforts or progress. It maintained the goal for him to be

returned home within 12 months, noting, however, that it did not know how long that goal could continue.

¶ 14    In a permanency report that DCFS filed in J.C.'s case on March 7, 2019, it noted that respondent was unemployed and still using heroin. She had not been referred to parenting and individual counseling because of her substance abuse. Respondent was incarcerated on January 11, 2019, on charges of theft and possession of a controlled substance. She was allowed visitation with her children on Sundays, but she had been very inconsistent with her visits, cancelling some visits and walking out of others.

¶ 15    In an April 4, 2019, permanency-review report, also in J.C.'s case, DCFS noted that respondent was released from jail in February but that she had been arrested again in March and was currently still in custody. At a permanency-review hearing on both cases on May 13, 2019, respondent was no longer in custody but did not appear for the hearing. The State asked the court to take judicial notice of the report filed, the service plans, and J.C.'s and A.K.'s orders of adjudication. No further evidence was presented. The State asked the court to find that respondent had not made reasonable efforts or progress. It reported that it would be filing a petition to terminate respondent's rights as to J.C. Also, although A.K.'s case was still within the nine-month period, the State planned to move toward an expedited termination of parental rights because it did not see that respondent had any possibility of parental rehabilitation. The court found that respondent had again failed to make reasonable efforts or progress, and it changed the goal to substitute care pending a determination of termination of parental rights for both children.

¶ 16    On May 30, 2019, the State filed a motion for termination of respondent's parental rights in both J.C.'s and A.K.'s cases. The motion filed in J.C.'s case contained three counts. Count I alleged that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to J.C.'s welfare, citing section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)). Count II alleged that respondent had failed to make reasonable efforts to correct the conditions that caused J.C. to be removed during any nine-month period after he was adjudicated an abused or neglected minor (*id.* § 1(D)(m)(i)), and count III alleged that respondent had failed to make reasonable progress toward J.C.'s return within any nine-month period after J.C. was adjudicated an abused or neglected minor (*id.* § 1(D)(m)(ii)). For purposes of counts II and III, the State referred to the nine-month periods from February 8 to November 9, 2018, and August 9, 2018, to May 15, 2019. The motion filed in A.K.'s case contained only one count and alleged that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to A.K.'s welfare. See *id.* § 1(D)(b).

¶ 17    An unfitness hearing was held on August 15, 2019. Hope Phillips testified that she was an LSS supervisor. Phillips identified the People's exhibits 1 through 4. She identified the exhibits as six-month service plans for respondent and identified their respective dates. The court admitted the exhibits without objection.

¶ 18    The State noted that it had no further witnesses to present, and it asked the court to take judicial notice of the neglect petitions filed in both cases as well as the adjudicatory orders and the orders following the permanency reviews. The court took judicial notice of these documents, and the State rested its case.

¶ 19    The GAL asked the court to admit into evidence her exhibits 1 and 2, certified "indicated packets" containing the DCFS investigations in both A.K.'s and J.C.'s cases, which were labeled "SCR2320040A" and "SCR2320040B." The exhibits were admitted into evidence

without objection. The cause was then continued to October 11, 2019. On that date, no further testimony was presented, and the parties made their closing arguments.

¶ 20   In its closing argument, the State argued that it had proven by clear and convincing evidence that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as alleged in A.K.'s case and in count I of J.C.'s case. It also contended that the evidence showed that respondent had failed to make reasonable efforts or progress as alleged in J.C.'s case. In support, the State referred to the permanency-review orders where the court had made findings as to respondent's lack of reasonable efforts or progress. It also referred to the service plans as evidence that respondent was continuing to use heroin as of December 2018, had not met with her caseworker, had not signed consents, and never completed a substance abuse program as required in her service plans. The service plans also showed that respondent missed several visitations with A.K. and J.C.

¶ 21   In the GAL's summation, she referred to her exhibit 1, the indicated packet on A.K. She discussed the investigation surrounding respondent's call to the police of shots fired outside her home and the fact that, at that time, respondent was inside the house using heroin, and A.K. was present at the scene. The GAL recommended that the court find that the State had met its burden of proof.

¶ 22   After hearing all the evidence, the court found that the State had proven by clear and convincing evidence all of the counts in both motions to terminate parental rights, and it found respondent to be an unfit parent on all those grounds.

¶ 23   The court subsequently held a best-interests hearing. At the hearing, the court allowed into evidence two more GAL exhibits. Exhibit 1 contained several pictures of A.K. and her foster parents as well as a letter from her foster parents indicating that they wished to adopt A.K. Exhibit 2 was a letter from Safe From the Start, a program within the Children's Advocacy Center, recommending that A.K. remain in the care of her foster parents. At the conclusion of the hearing, the court found that it was in A.K.'s and J.C.'s best interests that respondent's parental rights be terminated, and it entered an order terminating respondent's parental rights.

¶ 24   Respondent timely appeals the trial court's unfitness findings, on the grounds that it admitted and relied upon inadmissible hearsay and irrelevant documents.[1]

¶ 25                                   II. ANALYSIS

¶ 26   On appeal, respondent claims that the trial court erred in admitting two GAL exhibits, the pictures and the letter from A.K.'s foster parents and the letter from Safe From the Start, at the unfitness hearing. Respondent argues that those exhibits should not have been admitted into evidence, because they were irrelevant as to the issue of unfitness. Respondent also argues that the trial court erred in admitting the GAL's exhibits 1 and 2, the "indicated packets" on A.K. and J.C., at the unfitness hearing, because they contained inadmissible hearsay and did not qualify as indicated reports under section 2-18(4)(b) of the Juvenile Court Act (705 ILCS 405/2-18(4)(b) (West 2018)), as the State claimed. In support of this contention, she cites *In re G.V.*, 2018 IL App (3d) 180272, and *In re J.C.*, 2012 IL App (4th) 110861. Finally, though respondent acknowledges that she has waived these alleged errors due to her failure to object before the trial court to the admission of these exhibits, she asks this court to review this issue

_____

[1]We note, however, that respondent is not otherwise challenging the sufficiency of the evidence finding her to be an unfit parent.

as plain error. Since the termination of parental rights affects a fundamental liberty interest, we will consider the issue for plain error. *In re L.B.*, 2015 IL App (3d) 150023, ¶ 11.

¶ 27 Termination-of-parental-rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2018)). *In re D.F.*, 201 Ill. 2d 476, 494 (2002). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process in seeking to terminate parental rights involuntarily. See 705 ILCS 405/2-29(2) (West 2018). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). 705 ILCS 405/2-29(2), (4) (West 2018). If the court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove, by a preponderance of the evidence, that termination of parental rights is in the best interests of the child. *Id.* § 2-29(2). On appeal, the trial court's findings of parental unfitness and that termination of parental rights was in the child's best interests will not be disturbed unless they are contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A determination is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence. *In re D.F.*, 201 Ill. 2d at 498.

¶ 28 A trial court's decision to admit evidence during a termination-of-parental-rights hearing is reviewed for an abuse of discretion. *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 22. The trial court abuses its discretion when no reasonable person would adopt the trial court's view. *Id.*

¶ 29 Section 2-18(4)(a) of the Juvenile Court Act provides:

"Any writing, record, photograph or x-ray of any hospital or public or private agency, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. A certification by the head or responsible employee of the hospital or agency that the writing, record, photograph or x-ray is the full and complete record of the condition, act, transaction, occurrence or event and that it satisfies the conditions of this paragraph shall be *prima facie* evidence of the facts contained in such certification. A certification by someone other than the head of the hospital or agency shall be accompanied by a photocopy of a delegation of authority signed by both the head of the hospital or agency and by such other employee. *All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility.*" (Emphasis added.) 705 ILCS 405/2-18(4)(a) (West 2018).

¶ 30 An indicated report is "any report of child abuse or neglect made to [DCFS] for which it is determined, after an investigation, that credible evidence of the alleged abuse or neglect exists." 89 Ill. Adm. Code 300.20 (2018); see also 325 ILCS 5/3 (West 2018) (" 'An indicated report' means a report made under [the Abused and Neglected Child Reporting] Act if an

investigation determines that credible evidence of the alleged abuse or neglect exists."). An indicated report filed pursuant to the Abused and Neglected Child Reporting Act shall be admissible in evidence. 705 ILCS 405/2-18(4)(b) (West 2018). Sections 2-18(4)(a) and (4)(b) provide exceptions to the hearsay bar. See *In re J.C.*, 2012 IL App (4th) 110861, ¶ 23; *In re A.B.*, 308 Ill. App. 3d 227, 235 (1999).

¶ 31     We first address respondent's claim that the trial court erred in admitting two GAL exhibits: the pictures and the letter from A.K.'s foster parents and the letter from Safe From the Start recommending that A.K. remain in the custody of her foster parents. Respondent argues that the trial court abused its discretion in admitting these exhibits into evidence at the unfitness hearing, because they were irrelevant to the issue of her alleged unfitness. She contends that we can infer that the trial court relied upon those exhibits at the unfitness hearing when it remarked in its ruling that the GAL's exhibits were "quite sad."

¶ 32     Respondent's contentions regarding these two exhibits, however, are belied by the record. As the State points out, these exhibits were admitted at the best interest-interests hearing, about which respondent raises no claims of error, and not at the unfitness hearing. What the trial court said was that "[t]he indicated packets were really quite sad," and the packets did not include the letters from the foster parents or Safe From the Start. Therefore, these evidentiary claims have no merit.

¶ 33     We also find no error in the trial court admitting the GAL's exhibits 1 and 2 into evidence at the unfitness hearing. A review of those exhibits demonstrates that each report contains the proper certification and notes, with specific dates and times for the events described in the reports. Many of the events reported came from either a DCFS investigator who was present for the event or admissions from respondent herself. In SCR 2329940A, it was reported that a DCFS investigator visited J.C. in the hospital after his birth. J.C. had tested positive for cocaine and opiates and was suffering from withdrawal symptoms. The DCFS investigator explained the steps she took to locate respondent after respondent signed herself out of the hospital against medical advice. When J.C. was ready to be released from the hospital, the investigator could not find respondent. She had given the hospital a false name and birth date for herself, and the investigator verified that fact with the hospital. Respondent admitted to the investigator that she had given the hospital false information regarding her identity. She also admitted to the investigator and hospital personnel that she had used heroin and other drugs while pregnant with J.C.

¶ 34     Respondent takes issue with this report because, she claims, the DCFS investigator did not note how she learned that J.C. was born with drugs in his system or the specific drugs for which he tested positive. Our review of the report indicates that the investigator spoke to a Michelle Strand-Dorsey on November 27, 2017, who told the investigator that J.C. had heroin and cocaine in his system at birth. The investigator also reported that on December 8, 2017, she spoke with Dr. Frank Hernandez, who specifically noted each drug that was found in J.C.'s system at birth. With regard to any portion of the report that does not specifically delineate how certain information was gleaned, we remind respondent that a lack of knowledge on the part of the reporter goes to the report's weight and not its admissibility. 705 ILCS 405/2-18(4)(a) (West 2018).

¶ 35     In SCR 2329940B, Landgraff, a police officer, made the initial DCFS report that A.K. was at respondent's house when respondent and another person (initially misidentified by respondent as her brother but later revealed to be both children's father) had gone outside of

the home to participate in a drug deal for heroin. The drug deal "went bad," and shots were fired. Respondent told Landgraff that her "brother" had fled with A.K. after the incident and that she could not find her. The report also indicated that respondent admitted to the DCFS investigator that she used heroin and crack cocaine. The investigator and Landgraff both observed the condition of the house and reported it to be filthy and not fit for a child to reside in. When the investigator was finally able to locate A.K., she was dirty, had no underwear on, and had a blister on her foot and scratches on her back and leg.

¶ 36       We are not persuaded by the cases respondent relies on to support her argument that the trial court erred in admitting the GAL's exhibits at the unfitness hearing. In *In re G.V.*, 2018 IL App (3rd) 180272, ¶ 34, the Third District held that the admission into evidence of an investigatory report as an indicated report did not comply with the Juvenile Court Act and deprived the parents of due process. In that case, other than the first four pages, the investigatory report was of an investigation from another state, without any verification that the information contained in that report was brought to the attention of DCFS or that the information was even based upon anyone's personal knowledge. *Id.* ¶¶ 30-32. Here, we have quite the opposite. All the information in both GAL exhibits was properly certified. The overwhelming majority of the information reported came from either a person who had firsthand knowledge of the information in the report or admissions by respondent herself. Regarding the few pages in the report where the DCFS investigator did not note how she learned what specific drugs were in J.C.'s system, that information was contained elsewhere in the report, and as we have noted, lack of firsthand knowledge goes to the weight of the report and not its admissibility. 705 ILCS 405/2-18(4)(a) (West 2018). Moreover, as we noted in *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 68, *In re G.V.* is of questionable value on this evidentiary question in that it never mentioned or discussed section 2-18(4)(a) of the Juvenile Court Act (705 ILCS 405/2-18(4)(a) (West 2018)).

¶ 37       Nor is *In re J.C.*, 2012 IL App (4th) 110861, of avail to respondent. In that case, DCFS's "indicated reports" contained printouts of the entire DCFS case file, which included records from agencies other than DCFS. *Id.* ¶¶ 10-14. The appellate court said that it found no basis for including an entire DCFS investigatory file within the definition of an "indicated report" and that therefore the trial court erred by admitting the State's exhibits in their entirety on that basis. *Id.* ¶¶ 23-24.

¶ 38       Here, the reports in the GAL's exhibits 1 and 2 did not include the entire DCFS case file. On the contrary, the overwhelming majority of the documents in those reports reflected exactly how, when, and from whom the information contained in the reports was brought to DCFS's attention. In addition, each of those exhibits contained a certification that established the foundation for the admission of the reports pursuant to section 2-18(4)(a) of the Juvenile Court Act. 705 ILCS 405/2-18(4)(a) (West 2018). The reports were also properly considered indicated reports because they contained credible evidence of J.C.'s and A.K.'s neglect. For all these reasons, we find that these exhibits were properly admitted into evidence under both sections 2-18(4)(a) and 2-18(4)(b). *Id.* § 2-18(4)(a), (b).

¶ 39                                    III. CONCLUSION

¶ 40       In sum, we did not need to address the admissibility of two of the GAL's exhibits, since the record made it clear that they were not admitted into evidence at the unfitness hearing, as respondent claimed. Also, the trial court did not abuse its discretion in allowing the GAL's

exhibits 1 and 2 to be admitted into evidence at the unfitness hearing, since they were certified records that contained credible evidence of J.C.'s and A.K.'s neglect. For these reasons, the trial court's order terminating the respondent's parental rights to J.C. and A.K. is affirmed.

¶ 41 The judgment of the circuit court of Winnebago County is affirmed.

¶ 42 Affirmed.