2022 IL App (2d) 210427-U
No. 2-21-0427
Order filed February 16, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF DAWN STASZAK, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | No. 16-D-1047 |
| CHRISTOPHER STASZAK, | ) ) ) | Honorable William J. Parkhurst, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Zenoff and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion in modifying the respondent's maintenance obligation, denying the petitioner's petition to modify the parenting schedule, or in denying the petitioner's request for a contempt finding.

¶ 2    The marriage of the petitioner, Dawn Staszak, and the respondent, Christopher Staszak, was dissolved in September 2018. After the judgment was entered, various petitions and motions were filed, including contempt petitions, a motion to modify maintenance and child support, and a petition to restrict Christopher's parenting time. On July 2, 2021, the trial court entered a final order that resolved all of the pending claims. Dawn appeals from this order. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The parties' 17-year marriage was dissolved in 2018. Two children were born of the parties, namely, William, born October 8, 2008, and Victoria, born November 9, 2010. At the time of dissolution, both parties were employed full-time, with Dawn earning a salary of $69,000 per year and Christopher earning a salary of $114,000 plus additional income from bonuses. The parties entered into a marital settlement agreement and an allocation judgment and parenting agreement (allocation judgment).

¶ 5      The marital settlement agreement provided that Christopher would pay $683.45 per month for 109 months to Dawn as maintenance. Christopher would pay $516.65 per month in child support, including six percent of any additional income earned above his regular salary. These were guideline amounts based on Christopher's employment income.

¶ 6      The allocation judgment provided that the parties would have shared parenting responsibilities for the children. Dawn was granted parenting time with the children except when Christopher had parenting time. Christopher had parenting time from Wednesday after school until Friday before school and on alternating weekends. The allocation judgment also provided that the parties would "not consume alcoholic beverages beyond the legal limit or any illegal substances during their parenting time or [eight] hours prior to their parenting time."

¶ 7      On January 11, 2019, Christopher filed a motion to modify and abate maintenance and child support. In his motion, Christopher alleged that he was laid off from his job, had no income, and was living off a severance package. Christopher also alleged that his loss of employment was not in bad faith or due to any fault of his own. Christopher argued that this was a substantial change in circumstances and a basis to abate his support obligations.

¶ 8    On January 16, 2019, Dawn filed an emergency motion to suspend parenting time and for a substance abuse evaluation pursuant to section 603.10 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/603.10 (West 2018)).  Dawn alleged that on the evening of January 12, 2019, she received a text message from her daughter that Christopher had fallen asleep while he and the children were watching a movie and that he could not be woken up. Dawn called the police department and requested a welfare check.  The police report indicated that upon arrival, Christopher could not stand, had slurred speech, and had a strong odor of alcohol on his breath.  Christopher initially denied drinking alcohol but later admitted that he may have had one or two drinks and taken some pills.  Christopher agreed to take a portable breath test which revealed a blood alcohol content of 0.259.  When the police requested that Christopher be evaluated by paramedics, he became combative.  The police had to handcuff Christopher until he calmed down.  The police called Dawn to pick up the children and notified the Department of Children and Family Services (DCFS).  Dawn alleged that the children were anxious and worried over the incident.  Dawn requested that Christopher's visitation be immediately suspended because his alcohol consumption violated the allocation judgment and seriously endangered the children's physical and emotional health.  She requested that Christopher be ordered to take a substance abuse evaluation and that visitation remain suspended until Christopher completed an appropriate treatment program.

¶ 9    On the same day, Dawn filed a petition for rule to show cause requesting a finding of indirect civil contempt against Christopher for his violation of the allocation judgment.  Dawn also requested that Christopher be ordered to pay reasonable attorney fees for the fees she incurred in filing the petition.

¶ 10    On January 17, 2019, the trial court entered an agreed order which required Christopher to purchase a Soberlink alcohol monitoring device and submit to testing prior to, during, and after any of his parenting time with the children.  The order indicated that if there was a positive test, Christopher's parenting time would be immediately suspended.  The order further required Christopher to complete a substance abuse assessment within 14 days.

¶ 11    Both parties filed motions on February 26, 2019.  Christopher filed a motion to immediately lift any parenting time restriction as he had the Soberlink system and had attended a substance abuse evaluation.  The evaluator determined that there were no findings of alcohol abuse or dependence and made no recommendations for further substance abuse treatment.

¶ 12    Dawn filed a motion to revoke parenting time and for attorney's fees.  Dawn alleged that Christopher had failed a Soberlink test on February 13, 2019, when he had parenting time with the children.  Specifically, he failed to test at 7 a.m. as required.  His test at 9:28 a.m. showed a positive BAC of 0.010.  A retest at 9:48 a.m. showed a positive BAC of 0.007.  Further, Dawn alleged that Christopher had failed to get a substance abuse assessment within 14 days, failed to go to a facility that the parties agreed upon, and that the evaluator who determined that Christopher did not need further substance abuse treatment was unqualified.  Dawn argued that Christopher's history of alcohol abuse and his positive Soberlink tests demonstrated that further parenting time with Christopher would seriously endanger their children's emotional and physical well-being.

¶ 13    On February 27, 2019, the trial court entered an agreed order appointing Dr. Daniel Hynan to conduct a substance abuse and mental health assessment of Christopher.  Dr. Hynan issued a report on June 14, 2019.  Dr. Hynan concluded that, due to Christopher's "very significant substance abuse and mental health problems," Christopher's parenting time should be supervised until his condition significantly improved.  Dr. Hynan recommended that Christopher should

participate in a mental health program that addressed both his alcohol abuse and his psychological problems, including depression and anxiety. Dr. Hynan further concluded that Soberlink should remain a requirement for Christopher for at least one year.

¶ 14   The record indicates that Christopher attended an outpatient treatment program at Linden Oaks Hospital in Naperville from July 31 to August 21, 2019. The treatment included individual and group therapy, medication education, discharge planning, and disease education. On August 21, 2019, Christopher was discharged from the program. A discharge note from the hospital indicated that Christopher had "made enough consistent and observable progress towards the completion of treatment goals."

¶ 15   On May 18, 2020, Dawn filed a petition to enforce the allocation judgment and the January 2019 agreed order. Dawn alleged that the January 2019 incident violated the allocation judgment because Christopher had consumed alcohol beyond the legal limit during his parenting time. Further, he violated the agreed order because he tested positive on Soberlink on three occasions. Further on January 15, 2020, he had been called to pick up Victoria from school because she was sick and he failed to take a Soberlink test. Dawn requested that Christopher be held in contempt for failure to abide by the orders, required to post a cash bond to ensure future compliance, ordered to pay a civil fine, and that Dawn be granted attorney fees.

¶ 16   Dr. Hynan issued a subsequent report on August 23, 2020. He had interviewed the parties and the children. Both children stated that, during the last year, they had not experienced anything at their father's house that made them feel scared, worried, or uncomfortable. Dr. Hynan opined that Christopher continued to minimize the extent of his problems and continued to consume alcohol. Dr. Hynan further opined that, even though there had been no recent issues with Christopher's behavior, there was substantial reason to be concerned that Christopher's health

could regress to the point where the children would become endangered. Dr. Hynan acknowledged that it was not possible to predict future behavior, and thus recommended that Christopher be required to continue Soberlink monitoring. Finally, while Dr. Hynan opined that Christopher did not fully commit to his treatment at Linden Oaks, he also acknowledged that there was no indication that Christopher was discharged from the program against medical advice.

¶ 17　The matter proceeded to a bench trial on January 20, 21, and 22, 2021. Dawn testified regarding the January 2019 incident when she requested a welfare check at Christopher's home. When she went to pick up the children, they were scared and kept asking if their father was going to die. Christopher came to her house the next day to show the children that he was okay. Dawn offered to have him stay for dinner but he declined. DCFS investigated and Christopher was indicated by DCFS for child endangerment.

¶ 18　Dawn further testified that there were times when Christopher was not compliant with Soberlink. The first time was February 13, 2019, when Christopher tested positive twice in the morning, but tested negative by 3 p.m. Christopher told her that he had accidentally used mouthwash. On June 29, 2019, Christopher's test was noncompliant because of a facial recognition issue. Christopher was also noncompliant on tests on June 5 and October 23, 2019, and one day in December 2020, when the kids were on Christmas break and with their father for the whole week. Dawn believed that Christopher had an alcohol abuse issue and that he did not accept it and did not take his treatment seriously.

¶ 19　Dawn further testified that William missed one day of school in September 2020 while in Christopher's care. Christopher told Dawn that he did not realize William had school that day. When Dawn talked to William about missing school, William said he wanted to "curl up and die." Dawn also testified that William had over a dozen missing school assignments that were due on

Christopher's parenting time. Dawn testified that she wanted the children to be with her during the week in the school year so that she can make sure they get to school and get their assignments completed and submitted. She preferred that Christopher only have parenting time for a couple of hours during the week and on alternating weekends.

¶ 20 Dawn testified that since January 2019 Christopher had not voluntarily made any support payments. Everything she received was garnished from his unemployment and stimulus checks. As of the date of trial, she had not received any support from Christopher since he started his new job in November 2020.

¶ 21 On cross-examination, Dawn acknowledged that the children did not miss any school for the 2018-2019 or 2019-2020 school years. When William missed school in September 2020, while with Christopher, William was on a fully remote schedule and failed to attend classes on Zoom. Dawn acknowledged that of Christopher's 1717 compliant Soberlink tests, there were noncompliant tests on three days. The first was on February 13, 2019, at 9:28 and 9:48 a.m., which showed BAC's of 0.01 and 0.007. At 11:45 a.m. the test was compliant, and tests at 3, 6, and 9 p.m. were also compliant. Christopher picked up the kids after school that day and Dawn acknowledged all his tests were compliant when he was with the children.

¶ 22 The second noncompliant test was on June 5, 2019. Christopher was noncompliant at 1:52 and 2:09 p.m., but tested compliant at 2:25, 6, and 9 p.m. that day while he was with the children. There was also a noncompliant test at 10:01 p.m. on June 29, 2019. It was rejected based on identity. But a test at 10:26 p.m. was compliant, as well as tests earlier in the day at 7 and 11 a.m., and at 3 and 7 p.m. Dawn testified that she took a vacation for five days in February 2020 and the children stayed with Christopher during that time. Finally, Dawn acknowledged that both children were doing satisfactorily in school.

¶ 23    Christopher testified that he had worked for Prudent Manager Advisors (PMA) for almost 16 years before he was let go on January 4, 2019.  Prior to that, at the beginning of October 2018, he had taken a leave of absence under the Family Medical Leave Act (FMLA).  His last position was associate vice president of the information technology department.  He was earning an annual salary of $114,000, plus bonuses.  He was told he was being let go because they were changing to a new programming system and he would no longer be needed.  He acknowledged that PMA's written documents showed that he was fired because he failed to learn the new system.  Christopher testified that this was not true, that learning the new system was not critical to his position there, and that PMA never offered him any training on the new system.  Christopher testified that he was doing much better after his leave of absence and had been looking forward to returning to work. However, he was fired before he returned.

¶ 24    Christopher testified that the incident with the police being called to his house happened about a week after he was terminated from PMA.  Although DCFS investigated, it did not recommend any safety measures or that his parenting time be limited in any way.  Christopher acknowledged using the Soberlink system and testified that he always tested when he had the children in his care.  Christopher testified that while he had abused alcohol, he did not have an alcohol abuse issue.  While he still drinks alcohol occasionally, he does not drink during his parenting time with the children.  He wanted his children to trust him and know that he is there for them.  He has a great relationship with his children and they enjoy being together.

¶ 25    Christopher testified that he participated in a treatment program at Linden Oaks in August 2019.  He attended sessions Monday through Friday from 8:30 a.m. until 11:45 a.m., which involved individual and group therapy.  He was originally told he would be in treatment for two to four weeks.  He missed three sessions because he was not able to find someone to watch the

children. He was discharged after four weeks. At some point his case therapist, Katrina Ramirez, left and he was assigned to a new therapist. The first day with the new therapist he was told he was being discharged. He asked the therapist to check with the psychiatrist and was told that the psychiatrist was approving his discharge. Christopher testified that he never asked or suggested that he should be discharged. After his discharge, he continued to meet with his regular therapist. He also participated in a program called Smart Recovery during his time at Linden Oaks and for a short time thereafter. Smart Recovery was similar to Alcoholics Anonymous but it was a remote online program. He still occasionally attended Smart Recovery.

¶ 26   Christopher further testified that his mental health had improved considerably since January 2019. He had started a new job as a network administrator on November 30, 2020. His annual salary was $77,000. While he was unemployed, he kept track of all his job search activities. He believed that it took him so long to find a job because his title at PMA was associate vice president and that made many employers think they could not afford him. Christopher testified that since William was in sixth grade he received letter grades. William had straight A's on his last report card. Victoria received grades of satisfactory. Christopher testified that the reason William missed one day of school in September 2020 was because he was not familiar with the hybrid schedule. He believed William went to school every other day. When he picked William up on Wednesday, William said he had school that day. Christopher assumed that Thursday was an off day. He later learned that Wednesdays were "flexible" which meant sometimes William had school two days in a row. Christopher acknowledged the importance of school and the importance of his children attending.

¶ 27   Christopher also testified that it has been difficult keeping things going during his unemployment. He incurred a lot of credit card debt and had to withdraw money from his

retirement accounts and his children's college savings accounts. He withdrew about $140,000 from those accounts and still had about $20,000 of it.

¶ 28    On cross-examination, Christopher acknowledged that prior to taking leave from PMA, he had sent some inappropriate text messages to his bosses and coworkers. One of the texts made a reference to "killing yourself." Christopher testified that he was not feeling suicidal when he wrote this. He was experiencing pressure at work and at home due to the divorce, and it felt like he was under a lot of weight, which was figuratively killing him. Christopher acknowledged the text messages were written in the evening and he had probably been drinking. Christopher testified that he had suffered from depression and anxiety for at least 10 years. He had a regular therapist and, during his leave from PMA, he saw his therapist weekly. When the divorce started, he resumed taking medication for his depression. Christopher was paid his salary during the time he was on leave under FMLA. He was not laid off because he failed to learn a new programming system. He believed that PMA only put that in the file to avoid a legal battle because he was being let go after returning from FMLA. He testified there was a transition of power while he was on leave, with half the company being under different ownership. He believed that could have been one reason for his being let go, because new ownership wanted to have their own people put in place.

¶ 29    Christopher acknowledged that, in his job search diary, there were a couple of two-week periods with few entries. This was because it was during the COVID lockdown and there were not many jobs being posted. But he was still looking for jobs daily and sending out resumes. If he sent in a resume and did not get a response, he did not put it in the diary. Christopher acknowledged receiving a severance package from PMA. He received his last paycheck January 15, 2019. He received a severance check for $38,000 on January 31, 2019. He also collected

unemployment until July 2019. Child support was garnished from the unemployment checks. He acknowledged that he retained his $20 per month wine club membership until December 2019.

¶ 30    Dawn submitted the discovery deposition of Katrina Ramirez. Ramirez testified that she had a doctorate degree in psychology. In 2017, she began an internship at Linden Oaks, essentially as a clinical therapist conducting group and individual therapy sessions. Ramirez testified that Christopher began an intensive outpatient therapy program on July 30, 2019. She worked with him while he was in treatment. He was evaluated and diagnosed with alcohol use disorder and unspecified depressive disorder. Christopher missed a couple days of therapy due to childcare issues. Ramirez testified that Christopher minimized his alcohol use throughout his treatment at Linden Oaks. This is normal at the beginning of treatment. However, usually, as patients progress in treatment, they become more aware of their drinking and how it negatively impacts their functioning and interpersonal relationships. Christopher never made this progression.

¶ 31    Ramirez further testified that Christopher refused a recommended family therapy session because he said his siblings were already aware of his issues. Her treatment notes indicated that he attended one Smart Recovery meeting outside of his treatment at Linden Oaks. This was short of the program's requirement for him to attend two or three sessions per week. Christopher told Ramirez that he was not attending because his drinking "was not quite there." Her internship ended on August 20, 2019. As of that date, she did not believe that Christopher had met all the program requirements or was ready to be discharged. She opined that, while Christopher attended the program, he was not really committed to working through the program. Ramirez acknowledged that Christopher's treating psychiatrist apparently determined that Christopher was ready to be discharged.

¶ 32    Dawn also submitted a discovery deposition of James Davis, Christopher's supervisor at PMA. Davis testified that Christopher was offered the opportunity to learn the new programming system at PMA, but he never took the opportunity to do so. Davis testified that if Christopher had learned the new system, he would likely still be employed at PMA. Finally, Dawn submitted Christopher's termination notice into evidence. The termination notice indicated that PMA had been transitioning to a new programming system since 2017 and that Christopher had not taken advantage of opportunities to learn the new system. While Christopher was on leave, PMA essentially moved over to the new system and Christopher's position was eliminated.

¶ 33    On March 8, 2021, Dawn filed an emergency motion to reopen the proofs, alleging that Christopher had a positive Soberlink test on March 6, 2021, at 6:59 a.m. with a BAC of 0.012 and at 7:16 a.m. with a BAC of 0.009. The emergency motion was set for hearing on March 22, 2021. There is no report of proceedings, but the parties entered a bystander's report. At the hearing on that date, the trial court reopened the proofs. The trial court admitted the Soberlink report dated March 6, 2021, and allowed testimony. Christopher initially testified that he could not remember drinking alcohol on March 5, 2021, but finally admitted that he "maybe *** had two glasses of wine." The trial court found that Christopher had alcohol and mental health issues which cost him his job in January 2019. The trial court denied Dawn's request for modification of parenting time. The trial court acknowledged that Christopher completed the program at Linden Oaks and had been approximately 94% compliant with Soberlink.

¶ 34    On March 24, 2021, Dawn filed a petition for clarification of ruling and for other relief. Dawn noted that the trial court had failed to address her May 2020 petition to enforce the allocation judgment and the January 2019 agreed order.

¶ 35    On May 25, 2021, the trial court entered a written ruling addressing the pending petitions. The trial court found that, after the divorce, Christopher began having emotional difficulties and took a leave from work under FMLA.  In January 2019, he was separated from his employer, but received $38,000 in severance and unemployment benefits through August 2019.  Although the employer "papered their file" to make it look as if Christopher was fired for cause, the trial court believed Christopher's testimony that he lost his job due to his emotional difficulties and not through an intentional effort to thwart child support payments.

¶ 36    The trial court found that Christopher obtained new employment in November 2020 at a salary of $75,000, which was a reduction from his previous salary of $114,000.  While unemployed, Christopher withdrew a total of $120,000 from his IRA, 401K, and the children's college savings accounts.  The trial court noted that these withdrawals were income "for child support purposes."  The trial court stated that Christopher maintained his usual standard of living during his unemployment, noting that he "remained current on his monthly expenses, he dined out, he maintained movie subscriptions and a *** wine club membership."  The trial court also found that Christopher made no voluntary payments toward child support, maintenance, or children's expenses while he was unemployed.

¶ 37    As to child support, the trial court noted that, during his unemployment, Christopher received $38,000 in severance, had made the noted withdrawals of $120,000, and received unemployment income through mid-2019.  Based on the foregoing, the trial court found that Christopher's "income for child support purposes was unchanged during his period of unemployment."  The trial court denied Christopher's motion to modify child support and found that Christopher owed child support during the entire time he was unemployed.

¶ 38    However, the trial court found that maintenance should be modified as a result of Christopher's unemployment. The trial court granted the motion to abate maintenance from January 15, 2019, to November 2020. The trial court acknowledged Dawn's argument that Christopher became voluntarily unemployed and thus had to continue paying maintenance. The trial court found that Christopher's unemployment was involuntary and due to the emotional problems he experienced following the divorce.

¶ 39    Finally, as to parenting time, the trial court found that Christopher had substantially complied with the use of Soberlink for over two years. Further, despite an initial substance abuse evaluation recommending no treatment, Christopher cooperated with Dawn's request to be evaluated by Dr. Hynan. Per Dr. Hynan's recommendation, Christopher attended an intensive outpatient treatment program at Linden Oaks. The trial court found that there was no evidence that Christopher was discharged from the program against medical advice. The trial court found that Christopher's further use of Soberlink was not in the best interest of the children and that any parenting time restriction based on a positive Soberlink test was no longer appropriate. The trial court noted, however, that Dawn could petition the trial court to continue the use of Soberlink at her own expense.

¶ 40    On July 2, 2021, the trial court entered two related orders. The first order reiterated the trial court's ruling on Christopher's motion to abate maintenance, finding that no maintenance was due from January 15, 2019, to November 2020, during Christopher's unemployment. The second order incorporated the May 25, 2021, written decision and made further rulings. Specifically, the trial court denied Dawn's motion to restrict parenting time, to order mental health treatment, to require that Christopher turnover firearms, and to modify the parenting schedule. The trial court

ordered that Christopher could immediately resume his unsupervised parenting time as provided in the allocation judgment and cease use of Soberlink.

¶ 41 On July 29, 2021, Dawn filed a petition for attorney's fees and costs under section 508(b) of the Dissolution Act (750 ILCS 5/508(b) (West 2020)). On July 30, 2021, she filed a notice of appeal from the trial court's July 2, 2021, orders. On October 7, 2021, the trial court entered an order granting Dawn $24,242.19 in attorney fees. On December 21, 2021, this court entered a summary order dismissing Dawn's notice of appeal as premature because, at the time of filing, her petition for attorney fees was pending and there was nothing in the record indicating that it had been resolved. On January 3, 2022, Dawn filed a motion to establish jurisdiction and to supplement the record with the trial court's October 2021 order resolving her petition for attorney fees. We subsequently granted the motion and reinstated the appeal.

¶ 42                                        II. ANALYSIS

¶ 43 Dawn raises three issues on appeal. Dawn first argues that the trial court abused its discretion in modifying Christopher's maintenance obligation. Dawn next argues that the trial court abused its discretion in not modifying the parenting schedule. Finally, Dawn argues that the trial court erred in not ruling on her May 2020 petition to enforce the allocation judgment and the January 2019 agreed order. We will address each of these arguments in turn.

¶ 44                              A. Modification of Maintenance

¶ 45 Dawn argues that the trial court erred in abating Christopher's maintenance obligation retroactive to the date of his unemployment, January 15, 2019. Dawn first argues that Christopher's loss of employment was voluntary, in bad faith, and does not qualify as a substantial change in circumstances sufficient to warrant a modification of maintenance. Alternatively, she argues that there was no substantial change in circumstances because Christopher maintained the

same standard of living during his unemployment by collecting unemployment benefits and making withdrawals from his IRA and 401(k) accounts. Finally, she asserts that if a modification of maintenance was appropriate, it should only have been retroactive to May 2019, when Christopher was no longer receiving severance payments or unemployment benefits.

¶ 46  Section 510(a-5) of the Act provides that "[a]n order for maintenance may be modified *** upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a-5) (West 2018). A substantial change in circumstances typically means that there has been a change in the needs of the recipient spouse or the ability of the payor spouse to make the payments. *In re Marriage of Verhines and Hickey*, 2018 IL App (2d) 171034, ¶ 79. It has also been held that a substantial change in circumstances warranting modification "may occur upon involuntary change or loss of employment, and voluntary change of employment made in good faith." *In re Marriage of Brent*, 263 Ill. App. 3d 916, 922 (1994) (citing *In re Marriage of Kowski*, 123 Ill. App. 3d 811, 814 (1984)). "The party seeking modification of a maintenance order has the burden of showing that a substantial change in circumstances has occurred." *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 198 (2011).

¶ 47  We review a trial court's finding of a substantial change in circumstances under the manifest weight of the evidence standard. See *In re Marriage of Bates*, 212 Ill. 2d 489, 523 (2004) ("The standard of review of a support order is whether it is an abuse of discretion, or whether the factual predicate for the decision is against the manifest weight of the evidence."). If the trial court's finding of a substantial change in circumstances is against the manifest weight of the evidence, our inquiry is over: we will reverse the modification of maintenance. See 750 ILCS 5/510(a-5) (West 2014).

¶ 48    If, alternatively, we conclude that the finding of a substantial change in circumstances is not against the manifest weight of the evidence, we then review the trial court's decision as to whether to modify maintenance, and to what amount, for an abuse of discretion. *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009).  A trial court abuses its discretion when its decision is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *Anderson*, 409 Ill. App. 3d at 199.  Further, we defer to the trial court, as the trier of fact, on issues of witness credibility and the weight to be given to the testimony. *Id.*

¶ 49    When a trial court determines that there has been a substantial change in circumstances, it may modify the maintenance award, but it is not required to do so. *Anderson*, 409 Ill. App. 3d at 203.  Rather, upon determining that there has been a substantial change in circumstances, the court must next weigh the same factors it considered when it made the initial award of maintenance and decide whether and under what terms to modify the award. *Id.* at 203-204.  The Dissolution Act requires consideration of the factors set forth in sections 510(a-5) and 504(a), including the needs of each party, the duration of the marriage relative to the maintenance payments previously paid, the property awarded to each party under the judgment of dissolution, each party's present and future earning capacity, and the change in each party's income since the prior judgment or order from which a modification is being sought.  See 750 ILCS 5/504(a), 510(a-5) (West 2018).

¶ 50    Dawn first argues that Christopher's loss of employment was voluntary and in bad faith and thus did not establish a substantial change in circumstances.  In support of her argument, Dawn cites to Christopher's termination notice, which indicated he was being let go because he failed to learn the new programming system, and Davis's testimony that, had Christopher learned the new system, he would likely still be employed at PMA.  Nonetheless, as we defer to the trial court on issues of fact and the credibility of the witnesses (*Anderson*, 409 Ill. App. 3d at 199), we find this

argument unpersuasive as there was evidence to support the trial court's determination. The trial court found Christopher's testimony, that he lost his job because of his emotional difficulties following the divorce, to be more credible than Davis's explanation for the termination. The trial court also found that PMA "papered their files as a case of termination for cause" to avert litigation because Christopher was let go after he returned from leave under FMLA. The record shows that the trial court considered all the evidence before it. As these were reasonable interpretations of the evidence, we cannot say the trial court's finding, that Christopher's loss of employment was involuntary and not in bad faith, was against the manifest weight of the evidence.

¶ 51    Dawn argues that, even if Christopher lost his job in good faith, the trial court should have imputed income to him because his subsequent failure to become reemployed was an attempt to evade his support obligations. If a trial court finds that a party is not making a good faith effort to earn sufficient income, the trial court may impute income to the party. *In re M.M.*, 2015 IL App (2d)140772, ¶ 44. "In order to impute income to a party, the [trial] court must find that the party is voluntarily unemployed, is attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity." *Id.*

¶ 52    In the present case, we cannot say the trial court erred in not imputing income to Christopher. As noted, the trial court found that Christopher was not voluntarily unemployed. As explained, this determination was not against the manifest weight of the evidence. Further, there was no evidence that Christopher failed to take advantage of an employment opportunity. The trial court found that Christopher used reasonable efforts to find new employment. There was evidence to support this determination. Christopher kept a job diary of his employment seeking activities while he was unemployed for about 22 months. Dawn argues that a couple of two-week periods with no entries shows that Christopher was not actively seeking employment opportunities.

However, Christopher testified that even though he did not have entries during those times, he was looking for job opportunities daily. He also testified that one of the two-week time periods was during the Covid lockdown and there were not as many job postings during that time. Based on the record before us, we cannot say the trial court's determination, that Christopher's job search efforts were reasonable, was not supported by the evidence.

¶ 53    Dawn next argues that there was no substantial change in circumstances because Christopher's income did not change while he was unemployed. The trial court specifically found that Christopher's income for child support purposes was unchanged during his unemployment, noting that Christopher received a severance, unemployment benefits, and made withdrawals from his IRA and 401(k) accounts, and from the children's college savings accounts.

¶ 54    Dawn is correct that the trial court found no change in income for child support purposes. Further, "income" has the same meaning with regard to maintenance and child support. *In re Marriage of Dahm-Schell and Schell*, 2021 IL 126802, ¶ 39. However, income is not the only consideration when determining whether there was a substantial change in circumstances. See 750 ILCS 5/510(a-5) (West 2018) (setting forth multiple factors for the trial court to consider); *In re Marriage of Verhines and Hickey*, 2018 IL App (2d) 171034, ¶ 81 (in a substantial change analysis, income is not the only measure of a parent's continued ability to pay); see also *In re Marriage of Pylawka*, 277 Ill. App. 3d 728, 732 (1996) (noting that the calculation of net income and the issue of whether a substantial change in circumstances has occurred are two distinct questions). One of the factors the trial court can consider is a change in employment status. *Id.* §(a-5)(1). As such, we cannot say the trial court's determination that Christopher's loss of employment income was a substantial change in circumstances was against the manifest weight of the evidence.

¶ 55    To the extent that Dawn is arguing that the modification of maintenance to zero during his unemployment was an abuse of discretion, we note that the trial court must again consider multiple factors in determining whether to modify maintenance. 750 ILCS 5/510(a-5); 5/504(a) (West 2018). The trial court's determination that Christopher's income did not change during his unemployment does not necessarily render the trial court's decision to abate maintenance to be an abuse of discretion. Here, the trial court could consider that the sources of Christopher's income had changed. See *Verhines*, 2018 IL App (2d) 171034, ¶ 82 (trial court must take "a holistic view of the obligor's financial position to determine whether he has the resources to meet his existing obligation without unduly compromising his ability to meet his own needs"). Christopher was receiving unemployment benefits and made withdrawals from his 401(k) and IRA accounts and from the children's college accounts to maintain his standard of living. See *Verhines*, 2018 IL App (2d) 171034, ¶ 85 (case law generally presumes that drawing upon retirement assets creates a hardship). The record indicates that each party received about $300,000 in retirement accounts upon dissolution. Accordingly, during his unemployment, Christopher depleted about a third of his retirement savings. The fact that the trial court did not modify the child support award during Christopher's unemployment does not mean the trial court did not have the discretion to modify the maintenance award. See *Verhines*, 2018 IL App (2d) 171034 ¶ 86 (the duty to support one's minor child is more absolute than the obligation to continue maintenance). Based on the record before us, we cannot say that no reasonable person would take the view adopted by the trial court.

¶ 56    Finally, Dawn argues that, even if a modification of maintenance was appropriate, it should have been made retroactive only to May 2019, when Christopher was no longer receiving severance and unemployment benefits. As noted, whether to modify maintenance following a substantial change in circumstances is a matter within the trial court's discretion. *Blum*, 235 Ill.

2d at 36. Here, the trial court could have considered that, although Christopher received severance, he was still unemployed and not receiving a regular paycheck. Further, Christopher was unemployed for almost two years and needed to withdraw money from his retirement accounts and the children's college savings accounts to maintain his standard of living. Even though the opposite conclusion could have been reached under the circumstances, a decision is not an abuse of discretion merely because we may not have reached the same result as the trial court in the first instance. Our task on appeal is limited to the question of whether the trial court abused its discretion. See *Simmons v. Garces*, 198 Ill. 2d 541, 568 (2002) ("[i]n determining whether there has been an abuse of discretion, [a reviewing court] may not substitute [its] judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely"). Under the circumstances here, we cannot say that the trial court abused its discretion in abating maintenance as of the date of Christopher's final paycheck.

¶ 57                                     B. Parenting Schedule

¶ 58    Dawn's second contention on appeal is that the trial court erred in failing to modify the parenting schedule. Specifically, Dawn asserts that Christopher's repeated failure to comply with Soberlink, failure to treat his substance abuse and mental health issues, and his continued use of alcohol supported modifying the parenting schedule because (1) parenting time with Christopher posed a serious endangerment to the children or (2) modification was in the best interest of the children.

¶ 59 Section 603.10(a) of the Dissolution Act provides for the restriction of parental responsibilities, decision making, and/or parenting time, due to a parent's conduct. Specifically, section 603.10(a) states:

"After a hearing, if the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, the court shall enter orders necessary to protect the child."  750 ILCS 5/603.10 (West 2018).

¶ 60    The statute lists restrictions that the trial court may impose upon parental decision-making and parental time, which include, among other things: reducing, eliminating, or adjusting decision-making or parental time, and requiring supervision.  *Id.*  The serious-endangerment standard has been described as an "onerous, stringent, and rigorous" burden to meet.  *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 429 (1991).  Liberal visitation is the general rule and restricted visitation is the exception because parents have a natural or inherent right of access to their children, and because sound public policy encourages that strong family relationships be maintained.  *Id.*  The custodial parent has the burden of proving by a preponderance of the evidence that visitation with the noncustodial parent would seriously endanger the child.  *Id.*  We will not reverse a trial court's finding as to serious endangerment unless it is against the manifest weight of the evidence.  *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 59.  A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence.  *In re J.C.*, 2020 IL App (2d) 200063, ¶ 27.

¶ 61    In the present case, the trial court did not make an explicit finding as to serious endangerment.  However, by failing to modify the parenting schedule the trial court implicitly found that parenting time with Christopher did not seriously endanger the children.  This finding was not against the manifest weight of the evidence.  The record showed that Christopher had complied with using Soberlink for over two years and had only a handful of noncompliant results.  The trial court found that Christopher had been 94% compliant with Soberlink.  Further, Dr.

Hynan's 2020 report noted that the parties' children indicated that they had not experienced anything at Christopher's home in the past year that made them feel scared, worried, or uncomfortable. Further, Dr. Hynan noted there was no evidence that Christopher had recently behaved in a potentially dangerous way.

¶ 62    Dawn argues that Christopher did not genuinely participate in treatment at Linden Oaks and cites to Ramirez's testimony that Christopher did not really progress in the program because he denied and minimized his alcohol abuse issues. In addition to this evidence, however, there was also a discharge note that stated Christopher had "made enough consistent and observable progress towards the completion of treatment goals that the patient had been cleared for discharge." Further, Christopher testified that he had not asked to be discharged and was told that his treating psychiatrist had determined that he was ready for discharge. Because there was evidence to support the trial court's determination of no serious endangerment, we cannot say it was against the manifest weight of the evidence. *J.C.*, 2020 IL App (2d) 200063, ¶ 27.

¶ 63    Alternatively, Dawn argues that the trial court erred in failing to modify the parenting schedule on the basis that it was in the best interests of the children. A trial court has the authority to modify a parenting plan pursuant to section 610.5(c) of the Dissolution Act if the modification is necessary to serve the children's best interests. See 750 ILCS 5/610.5(c) (West 2018). Section 602.7(b) of the Dissolution Act sets forth a list of factors that a trial court can consider in determining an allocation of parenting time that it is the best interest of the child. *Id.* § 602.7(b). "Although a trial court must consider all relevant factors when determining the best interests of a child, it is not required to make an explicit finding or reference to each factor." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43.

¶ 64    A trial court's decision regarding whether to modify parenting responsibilities will be upheld unless it is against the manifest weight of the evidence. *Bates*, 212 Ill. 2d at 515. "In determining whether a judgment is contrary to the manifest weight of the evidence, the reviewing court views the evidence in the light most favorable to the appellee." *Id.* at 516. A reviewing court must afford great deference to the trial court as the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child. *Id.*

¶ 65    In support of her argument, Dawn notes that William had missed over a dozen homework assignments while in Christopher's care; when the children were with Christopher they ate dinner while playing electronics or watching television; the children were traumatized by the January 2019 incident; Christopher denied and minimized his substance abuse and mental health issues; Dr. Hynan's 2019 report indicated that Christopher's intoxication presented an increased risk to the children; and Christopher spoke negatively about her in front of the children. Further, Dawn asserts that Christopher's drinking and mental health issues demonstrated that it was not in the children's best interest for Christopher to have equal parenting time and that he should not have parenting time on weekdays during the school year.

¶ 66    Upon our review of the record, we cannot say that that the trial court's determination was against the manifest weight of the evidence. As noted by Dawn, the record does indicate that the children were traumatized by the January 2019 incident and that Christopher has had issues with alcohol use. However, since the January 2019 incident, the record also indicates that there has been improvement. The trial court found that Christopher substantially complied with the use of Soberlink. The record indicates that while there were a handful of noncompliant tests, only the most recent, on March 6, 2021, occurred when Christopher was actually in physical possession of the children. On that day, although he tested noncompliant that day at 6:59 and 7:16 a.m., he tested

compliant by 7:31 a.m. Further, none of the noncompliant tests indicated that Christopher's BAC was beyond the legal limit. Additionally, Christopher underwent multiple psychological evaluations and participated in an outpatient treatment program at Linden Oaks. The record indicates that since the January 2019 incident, there have been no other similar incidents and the parties' children indicated that they did not feel scared or worried while in Christopher's care. While Dr. Hynan opined in his 2020 report that there was substantial reason to be concerned that Christopher's health could regress to the point where the children would become endangered, he also acknowledged that it was not possible to predict future behavior. Consequently, it was just as possible that there would be no regression. Further, despite William missing a day of school and not turning in some homework assignments, both parties testified that, at the time of trial, the children were doing well in school. Accordingly, as the record does not make the opposite conclusion clearly apparent, we affirm the trial court's denial of Dawn's petition to modify the parenting schedule.

¶ 67                                  C. May 2020 Petition

¶ 68    Dawn's final contention on appeal is that the trial court erred when it failed to address her May 2020 petition to enforce the allocation judgment and January 2019 agreed order. Dawn argued that Christopher violated the allocation judgment when the police were called to his home in January 2019 and his BAC was above the legal limit. Further, he violated the January 2019 agreed order when he had noncompliant Soberlink tests. Dawn requested that Christopher be held in contempt for violating the orders and be ordered to pay fines and attorney fees.

¶ 69    At the outset, we note that Dawn abandoned the petition. We acknowledge that, following the March 2021 hearing on Dawn's motion to reopen the proofs, but prior to the trial court's May 2021 written ruling, Dawn filed a petition for clarification of ruling, noting that the trial court had

failed to address her May 2020 petition. However, she did not specifically request a ruling on her May 2020 petition in her written closing argument and she did not file a subsequent petition for clarification following the trial court's May or July 2021 written rulings. Under these circumstances, the petition was abandoned. See *Morse v. Donati*, 2019 IL App (2d) 180328, ¶ 33 (filing a notice of appeal without first obtaining a ruling on a motion constitutes abandonment of that motion).

¶ 70 Moreover, the trial court's ruling could be interpreted as an implicit denial of Dawn's May 2020 petition. Whether a party is guilty of contempt is a question for the trial court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984). Based on the circumstances in the present case, the trial court did not abuse its discretion in failing to hold Christopher in contempt for violating the allocation judgment or the 2019 agreed order. By the time of trial, it had been two and a half years since the January 2019 incident when Christopher violated the allocation judgment. After the incident, the parties entered an agreed order requiring Christopher to submit to Soberlink testing prior to and during his parenting time. The trial court found that Christopher had substantially complied with that requirement and the evidence in the record supports that determination. While there were a handful of noncompliant tests over a two-year period, none of those tests showed a BAC above the legal limit. Further, the record indicates that there have been no other dangerous incidents since January 2019 and that the children do not feel scared or worried when they are with Christopher. We therefore affirm the trial court's implicit denial of Dawn's petition.

¶ 71                                      III. CONCLUSION

¶ 72 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 73    Affirmed.